IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FLOYD STEED,

        Plaintiff,

vs.                                                                        No. CIV 09-1084 RB/GBW

ENDEAVOR ENERGY RESOURCES, LP,
successor through merger to
LCX ENERGY, LLC,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** is before the Court on Defendant's (Endeavor's) Motion for Summary

Judgment (Doc. 58), filed on November 12, 2010.  Jurisdiction arises under 28 U.S.C. § 1332.

Having considered the submissions and arguments of counsel, relevant law, and being otherwise

fully advised, the Court denies this Motion.

**I.     Background.**

On September 21, 2009, Plaintiff (Mr. Steed), filed suit in the Fifth Judicial District Court,

County of Eddy, State of New Mexico, alleging that LCX Energy, which has merged into

Endeavor,[1] conducted oil and gas operations on Mr. Steed's property located in Eddy County, New

Mexico, and caused surface damage to Mr. Steed's property.  (Doc. 1.)  Mr. Steed is a citizen of

New Mexico.  (*Id.*)  Endeavor is a Texas corporation with its principal place of business in Texas.

(*Id.*)  Mr. Steed alleges damages in excess of $75,000.  (*Id.*)  On November 13, 2009, Endeavor filed

a Notice of Removal pursuant to 28 U.S.C. § 1441(a), and removed the case to this Court based on

---

[1] For simplicity, LCX Energy is referred to herein as Endeavor.

diversity jurisdiction.  *See* 28 U.S.C. § 1332.

On January 20, 2010, Mr. Steed's Unopposed Motion to File Second Amended Complaint was granted.  (Doc. 16.)  In the Second Amended Complaint, Mr. Steed alleges that, in conducting oil and gas activities, Endeavor used his land in an unreasonable, unnecessary, and excessive manner, thereby damaging his land, road, and potentially his ground water.  (*Id.*)  Mr. Steed alleges claims under the Surface Owners Protection Act (SOPA), N.M. Stat. Ann. §§ 70-12-1 to 70-12-10, and New Mexico common law.  (*Id.*)  Mr. Steed seeks approximately $125,000 in compensatory damages, an unstated amount in punitive damages, attorney's fees, and costs.  (*Id.*)

Endeavor has moved for partial summary judgment, contending that SOPA is inapplicable. (Doc. 58.)  Mr. Steed opposes the motion for summary judgment, arguing that SOPA applies to Endeavor's oil and gas operations on his land.  (Doc. 59.)  In reply, Endeavor argues that its oil and gas operations on Mr. Steed's property are not subject to SOPA.  (Doc. 60.)

## II.   Standard.

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment is appropriate "only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' "  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (*quoting* Fed. R. Civ. P. 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party.  *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003).  If this burden is met, the nonmovant cannot rest on the pleadings, but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim.  *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (*citing Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (noting that, on summary judgment, the plaintiff can "no longer rest on the pleadings")).

The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Although "[t]he burden of showing the absence of a genuine issue of material fact . . . is upon the movant," *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005), the nonmovant " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' "  *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

III.    **Statement of Facts.**

On summary judgment, the Court must view the facts in a light most favorable to Mr. Steed, the non-moving party.  *See Turner*, 563 F.3d at 1142.  Thus, reasonable inferences are drawn and factual ambiguities are resolved in Mr. Steed's favor.  *Id.*

On January 31, 2006, Endeavor commenced drilling a natural gas well, known as the

Kincaid Well No. 111, located on Mr. Steed's surface estate. (Pretrial Order at 6, Doc. 54.) In July 2006, Mr. Steed contacted Mike Bratcher of the New Mexico Oil Conservation Division (NMOCD) with concerns over the closure of the drilling reserve pit. (Def. Ex. 1, Deposition of Mike Bratcher at 7-8, Doc. 58-1.)

In his deposition, Mr. Bratcher explained that a drilling reserve pit is used to manage fluids and solids during oil and gas drilling. (Bratcher Dep. at 8.) Cuttings, mud, fluids, and other drilling waste are placed in the pit as they come up out of the ground. (Bratcher Dep. at 8-9.) The pit in question was dug in a single horseshoe shape. (Bratcher Dep. at 10.)

In July 2006, when Mr. Bratcher arrived on the scene, Endeavor had used a trackhoe to move some of the cuttings to a fifteen-foot deep, plastic-lined burial trench to the north of the pit. (Bratcher Dep. 12-13.) In theory, under the then-applicable regulations, Endeavor was supposed to move all the cuttings and drilling waste to the plastic-lined trench for burial. (Bratcher Dep. at 14.) The drilling pit should not have been backfilled until the cuttings and drilling waste were moved from the pit and to the trench. (*Id.*) However, Endeavor had backfilled and covered up about half the pit without removing all the drilling waste. (Bratcher Dep. at 11; 46.)

NMOCD took samples of the floor of the pit as well as into some of the walls that had been partially covered up. (Bratcher Dep. at 18; 46.) The samples from the south and west walls of the pit came back "hot," *i.e.*, the samples showed chloride levels in excess of acceptable limits. (Bratcher Dep. at 15; 18.) Due to the elevated chloride levels, NMOCD directed Endeavor to clean up the contamination. (*Id.*)

Endeavor performed an initial clean up of about two thirds of the pit. (*Id.*) During the 2006 clean up, additional dirt was dug out and removed from the original pit area. (Bratcher Dep. at 44-

4

45.)  A second burial trench, to the west of the pit, was excavated.  (*Id.*)  However, about one third of the pit, on the east side, had already been covered up and was neither tested nor remediated in 2006.  (Bratcher Dep. at 18.)  By the end of 2006, the entire reserve pit was filled in.  (Bratcher Dep. at 17-18; 44-45.)

In 2008, Mr. Steed reported to the NMOCD that the east side of the drilling pit contained excessive chlorides from the 2006 drilling operations. (Bratcher Dep. at 17-18; 46-47.) After further investigation, NMOCD confirmed the presence of elevated levels of chlorides and determined that continued remediation would be necessary to eliminate the excessive chlorides. (Bratcher Dep. at 17-18; 46-47.) Mr. Bratcher opined that the contamination was the result of poor pit closure and stated that proper closure of the pit was the responsibility of the operator. (Bratcher Dep. at 49; 53-54.)

Endeavor re-entered Mr. Steed's land to perform a second remediation during the period of June 2008 to July 2009.  (Bratcher Dep. at 19-20; 25.)  Initially, Endeavor was required to re-excavate and enlarge the drilling pit.  (Bratcher Dep. at 20-21; 26-27.)  During June 2008, Mr. Bratcher observed that drilling waste remained embedded in the wall of the pit.  (Bratcher Dep. at 15.)  Additional samples showed elevated chloride levels extending from the pit to the original burial trench to the north of the drilling pit.  (Bratcher Dep. at 28-30.)

Due to the contamination, NMOCD required Endeavor to excavate the previously undisturbed area between the drilling pit and the original burial trench.  (Bratcher Dep. at 30-31.) Additionally, the edges of the drilling pit and the original trench were dug out and the footprint of the drilling pit was enlarged on all sides.  (Bratcher Dep. at 30.)

During the second remediation, Endeavor removed and hauled off a substantial amount of

5

dirt and dug a large hole. (Bratcher Dep. at 31; Pl. Ex. B, photographs attached to the Bratcher Dep. as Exs. 3 and 34, showing the area in June 2008, as the second NMOCD investigation began, and in 2009, showing the second excavation; Pl. Ex. C, diagram attached to the Bratcher Dep. as Ex. 44, showing the original pit and trench area drawn by Mr. Bratcher.)  Significantly, the following two areas were excavated in 2008, but had not been originally excavated in 2006: (1) the area between the pit and the original burial trench (approximately twelve to fifteen feet in width); and (2) the area around the pit and the original burial trench.  (Bratcher Dep. at 23-24; 30-31; 41; 43-44.)

Endeavor did not post a bond for the pit remediation.  (Pretrial Order at 6.)  In November 2009, the NMOCD approved final back-fill of the original drilling pit.  (Bratcher Dep. at 7-8; 42; 50-51.)

IV.    **Discussion.**

A.    **New Mexico substantive law applies.**

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  In applying state substantive law, the federal court's task is to "ascertain and apply the state law."  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quotations omitted).  The federal court must follow the most recent decisions of the state's highest court. *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

"When interpreting a state statute in a diversity case, this court must apply state rules of statutory construction."  *United Rentals Northwest, Inc. v. Yearout Mech., Inc.*, 573 F.3d 997, 1001 (10th Cir. 2009).  The New Mexico Supreme Court has stated: "The guiding principle of statutory construction is that a statute should be interpreted in a manner consistent with legislative intent."

*Hovet v. Allstate Ins. Co.*, 135 N.M. 397, 400, 89 P.3d 69, 72 (2004).  The primary indicator of legislative intent is the plain language of the statute. *Gen. Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 76, 703 P.2d 169, 173 (1985). "The entire statute is to be read as a whole so that each provision may be considered in its relation to every other part."  *State ex rel. Newsome v. Alarid*, 90 N.M. 790, 794, 568 P.2d 1236, 1240 (1977).  "To determine legislative intent, [the New Mexico Supreme Court] look[s] not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied." *Jolley v. Associated Electric & Gas Ins. Servs.*, 148 N.M. 436, 438, 237 P.3d 738, 740 (2010) (quotation omitted).

The New Mexico Supreme Court has yet to address the applicability of SOPA.  "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Wankier v. Crown Equip. Corp.*, 353 F.3d at 866.  In the absence of explicit guidance from the highest state court, this Court must attempt to predict, or make an "Erie-guess," as to how the New Mexico Supreme Court would rule. *See Pehle v. Farm Bureau Life Ins. Co., Inc.*, 397 F.3d 897, 901 (10th Cir. 2005).  In making an Erie-guess, this Court is "free to consider all resources available, including decisions of [state] Courts . . . [and] the general . . . trend of authority." *Pehle*, 397 F.3d at 902 (quotation omitted).[2]

Viewing the plain language and statutory scheme of SOPA against the backdrop of pre-SOPA New Mexico law, and applying New Mexico Supreme Court authority on statutory interpretation, it is apparent that the New Mexico Supreme Court would hold SOPA applicable to the facts of this matter.

---

[2] Neither party has asked this Court to certify the question to the New Mexico Supreme Court.

**B.      New Mexico law before and after the enactment of SOPA.**

Enacted in 2007, SOPA represented a marked shift in New Mexico law governing the relationship between surface owners and oil and gas operators. *See* N.M. Stat. Ann. §§ 70-12-1 through 70-12-10. Prior to SOPA, New Mexico law generally provided that the burden of proof was on the surface owner to demonstrate that an operator caused unreasonable damages to the surface estate. *See Amoco Prod. Co. v. Carter Farms Co.*, 103 N.M. 117, 120, 703 P.2d 894, 897 (N.M. 1985), *abrogated on other grounds by McNeill v. Burlington Res. Oil & Gas Co.*, 143 N.M. 740, 747, 182 P.3d 121, 128 (N.M. 2008). Under the prior regime, the operator was only liable for damage to the surface if the surface owner could show negligence, unless there was a contractual arrangement providing for damages. *See McNeill*, 143 N.M. at 749, 182 P.3d at 130; *Dean v. Paladin Exploration Co., Inc.*, 133 N.M. 491, 494, 64 P.3d 518, 521 (Ct. App. 2003) (holding that, where a contract expressly provided for the operator's liability for all damage to surface estate, plaintiff was not required to show negligence to recover for damages). In the absence of a contract, damage to the surface estate caused by an operator's reasonable use was not actionable. *McNeill*, 143 N.M. at 748, 182 P.3d at 129.

As its title suggests, and its provisions clearly demonstrate, SOPA was enacted to protect surface owners from oil and gas operators. Notably, SOPA requires oil and gas operators to "compensate the surface owner for damages sustained by the surface owner, as applicable, for loss of agricultural production and income, lost land value, lost use of and lost access to the surface owner's land and lost value of improvements caused by oil and gas operations." N.M. Stat. Ann. § 70-12-4(A). SOPA requires operators to "reclaim all the surface affected by the operator's oil and gas operations." N.M. Stat. Ann. § 70-12-4(C). "'Reclaim' means to substantially restore the

surface affected by oil and gas operations to the condition that existed prior to oil and gas operations, or as otherwise agreed to in writing by the operator and surface owner[.]" N.M. Stat. Ann. § 70-12-3(C).

In addition to imposing liability for damages and a duty to reclaim, SOPA requires the operator to provide a five-day notice to the surface owner if the activities do not disturb the surface, and a thirty-day notice before entering the surface to conduct oil and gas operations. *See* N.M. Stat. Ann. § 70-12-5. Significantly, SOPA describes activities that do not disturb the surface as "including inspections, staking, surveys, measurements and general evaluation of proposed routes and sites for oil and gas operations[.]" N.M. Stat. Ann. § 70-12-5(A).

SOPA applies to all oil and gas operations commenced on or after July 1, 2007, except for "maintenance and ongoing production activities related to an oil or gas well producing or capable of producing oil or gas on June 30, 2007 . . ." N.M. Stat. Ann. § 70-12-10(A). However, SOPA contains two limitations on this exception:

> (1) reentries, workovers and other oil or gas operations are subject to that act if the activities disturb additional surface; and
>
> (2) the duty to reclaim, as stated in Subsection C of Section 3 of that act, is applicable to such a well that is not plugged and abandoned on July 1, 2007[.]

N.M. Stat. Ann. § 70-12-10 (A)(1) and (2).

The first limitation is at issue herein.

**C.      SOPA applies to Endeavor's oil and gas operations on Mr. Steed's land.**

Endeavor commenced its oil and gas operations on Mr. Steed's property before July 1, 2007, which was the effective date of SOPA. In that the well was producing, or capable of producing, oil or gas as of June 30, 2007, maintenance and ongoing production activities related to the well would

be exempt from SOPA by the terms of N.M. Stat. Ann. § 70-12-10(A).  However, § 70-12-10(A)(1) establishes that SOPA applies to "reentries, workovers and other oil or gas operations commenced before the effective date if such activities disturb additional surface."  *Id*.  The crucial question is whether the further remediation is covered by § 70-12-10(A)(1).

Endeavor argues that the principle of ejusdem generis dictates that judicial interpretation of the term "other oil and gas operation" as used in § 70-12-10(A)(1) should be limited by the statute's reference to "reentries and workovers" to activities undertaken in the well to increase production from a well and should not include remediation activities.

"The principle of ejusdem generis literally means of the same kind or species."  *State v. Johnson*, 147 N.M. 177, 182, 218 P.3d 863, 868 (2009) (internal quotation and quotation marks omitted).  "New Mexico courts have long recognized the ejusdem generis principle of statutory construction, that where general words follow words of a more specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned."  *State v. Nick R.*, 147 N.M. 182, 187, 218 P.3d 868, 873 (2009) (internal quotation and quotation marks omitted).

"In applying this doctrine, [the New Mexico Supreme Court] look[s] to the specific terms employed and seek[s] the common characteristics among them, excluding anything that does not share those characteristics."  *Maralex Resources, Inc. v. Gilbreath*, 134 N.M. 308, 319, 76 P.3d 626, 636 (2003).  For instance, the meaning of "weapons" in catchall phrases of statutes "would necessarily share the attributes of the items specifically named, that is, inherently dangerous items that either are carried for use or are actually used to inflict injuries on people" and would not include a pocketknife  *State v. Nick R.*, 147 N.M. at 187, 218 P.3d at 873.

Endeavor suggests that the terms "reentries" and "workovers" are terms of art that apply only to procedures performed within oil and gas wells to increase production. In support of this stance, Endeavor cites to N.M. Stat. Ann. § 7-29B-3(B), which states, in pertinent part:

> A natural gas or oil well shall be approved by the division as a well workover project if . . . (2) the division determines that the procedure performed by the operator of the well is a procedure to increase the production from the well, but is not routine maintenance performed by a prudent operator to maintain the well in operation. Such procedures may include, but are not limited to: (a) re-entry into the well to drill deeper, to sidetrack to a different location or to recomplete for production . . . .

N.M. Stat. Ann. § 7-29B-3(B). Endeavor also cites to N.M. Admin. Code 19.15.6, which contains similar language. *See* N.M. Admin. Code 19.15.6. The authorities cited by Endeavor indicate that the term "workovers" does refer to activities performed within a well to increase production. However, it is not at all clear that the term "reentries" is so limited.

In any event, assuming without deciding that the terms "reentries" and "workovers" refer to procedures performed in a well to increase production, they do not exclude reclamation or remediation activities from the reach of SOPA based on ejusdem generis. The doctrine looks to the common characteristics of the terms within the statute. *Maralex Resources, Inc.*, 134 N.M. at 319, 76 P.3d at 636. The common thread is that reentries and workovers are activities that may be anticipated during the life of a well. Reclamations and remediations both fall into the category of activities that may be anticipated in the life of a well. The key phrase in § 70-12-10(A)(1) is "if such activities disturb additional surface." To the extent that any of those anticipated activities result in additional disturbances to the surface, SOPA applies. *Id.* Thus, an operator may perform workovers or reclamations on wells that predate SOPA, without triggering SOPA, so long as the procedures do not disturb additional surface. This reading harmonizes with the clear purpose of SOPA, which

is to protect the use of the surface for the benefit of the surface owner.

Alternatively, ejusdem generis applies only when the statutory text is uncertain. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 139 n. 2 (2001) (stating that "the [United States Supreme] Court has repeatedly explained that the canon is triggered only by uncertain statutory text"); *see also Garcia Y Perea v. Barela,*6 N.M. 239, 27 P. 507 (N.M. Terr. 1891) ("The rule is not an arbitrary one, and is only to be invoked . . . when the language used is uncertain.). The text of SOPA is not uncertain. SOPA explicitly defines "oil and gas operations" as "all activities affecting the surface owner's land that are associated with exploration, drilling or production of oil or gas, through final reclamation of the affected surface." N.M. Stat. Ann. § 70-12-3(A). In that SOPA expressly includes final reclamation within the term "oil and gas operations," the principle of ejusdem generis would not exclude the remediation from the "other oil and gas operations" as used in § 70-12-10(A).

Endeavor additionally argues that the strip of land between the drilling pit and the original burial trench, as well as the areas surrounding the drilling pit and the original burial trench, were disturbed by the scraping referenced in a settlement negotiation letter between counsel, dated November 26, 2007. Mr. Steed disputes the evidentiary value of this letter and points out the scope of the drilling site referenced in the letter is not defined. Mr. Steed's objections are well-taken.

"At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (citation omitted). In that the statement regarding scraping was made during settlement negotiations, the Court is not convinced that the statement would be admissible at trial for the truth of the matter asserted, *i.e.,* that the areas in question were scraped in 2006. The Court takes judicial notice that there was no reason to scrape

the entire area of the pad site to a depth of eighteen inches.  Notably, Mr. Bratcher observed the area in 2006, yet his deposition does not indicate that the entire area was scraped.  For these reasons, the letter does not establish that the areas in question were disturbed prior to July 1, 2007, within the meaning of § 70-12-10(A)(1).

Endeavor's contention that the running of the trackhoe on the site disturbed the surface of the areas in question is similarly unavailing. Running a vehicle, such as trackhoe, across the surface is the type of activity that SOPA classifies as not disturbing the surface. *See* N.M. Stat. Ann. § 70-12-5(A) (stating that activities that do not disturb the surface include "inspections, staking, surveys, measurements and general evaluation of proposed routes and sites for oil and gas operations[.]". Mr. Bratcher testified in his deposition that no excavation occurred on the strip of land between the drilling pit and original burial trench until the area was dug out during the second remediation in 2008 and 2009. (Bratcher Dep. at 57-58.) In fact, rather than supporting Endeavor's argument, Mr. Bratcher's deposition testimony establishes that the area between the pit and the original burial trench was undisturbed until the second remediation.

In 2008 and 2009, after the effective date of SOPA, Endeavor performed a further remediation on Mr. Steed's property, as required by NMOCD, for oil and gas operations that disturbed additional surface.  More specifically, the following two areas were excavated in 2008, but they had not been originally excavated in 2006: (1) the area between the pit and the original burial trench (approximately twelve to fifteen feet in width); and (2) the area around the pit and the original burial trench.  (Bratcher Dep. at 23-24; 30-31; 41; 43-44.)

Considered in the aggregate and viewed in the light most favorable to Mr. Steed, the record as presently developed indicates that the further remediation in 2008 and 2009 disturbed additional

13

surface within the meaning of § 70-12-10(A)(1).  Accordingly, the motion for summary judgment must be denied.

**THEREFORE,**

      **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 58), filed on November 12, 2010, is **DENIED**.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**